Justice THOMAS, concurring.
I join the Court's opinion in full but write separately to explain that I would find § 5 of the Voting Rights Act unconstitutional as well. The Court's opinion sets forth the reasons.
"The Voting Rights Act of 1965 employed extraordinary measures to address an extraordinary problem." Ante, at 2618. In the face of "unremitting and ingenious defiance" of citizens' constitutionally protected right to vote, § 5 was necessary to give effect to the Fifteenth Amendment in particular regions of the country. South Carolina v. Katzenbach, 383 U.S. 301, 309, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966). Though § 5's preclearance *558 requirement represented a "shar[p] depart[ure]" from "basic principles" of federalism and the equal sovereignty of the States, ante, at 2622, 2623, the Court upheld the measure against early constitutional challenges because it was necessary at the time to address "voting discrimination where it persist[ed] on a pervasive scale." Katzenbach, supra, at 308, 86 S.Ct. 803.
Today, our Nation has changed. "[T]he conditions that originally justified [§ 5] no longer characterize voting in the covered jurisdictions." Ante, at 2618. As the Court explains: " '[V]oter turnout and registration rates now approach parity. Blatantly discriminatory evasions of federal decrees are rare. And minority candidates hold office at unprecedented levels.' " Ante, at 2625 (quoting *2632 Northwest Austin Municipal Util. Dist. No. One v. Holder, 557 U.S. 193, 202, 129 S.Ct. 2504, 174 L.Ed.2d 140 (2009) ).
In spite of these improvements, however, Congress increased the already significant burdens of § 5. Following its reenactment in 2006, the Voting Rights Act was amended to "prohibit more conduct than before." Ante, at 2621. "Section 5 now forbids voting changes with 'any discriminatory purpose' as well as voting changes that diminish the ability of citizens, on account of race, color, or language minority status, 'to elect their preferred candidates of choice.' " Ante, at 2621. While the pre-2006 version of the Act went well beyond protection guaranteed under the Constitution, see Reno v. Bossier Parish School Bd., 520 U.S. 471, 480-482, 117 S.Ct. 1491, 137 L.Ed.2d 730 (1997), it now goes even further.
It is, thus, quite fitting that the Court repeatedly points out that this legislation is "extraordinary" and "unprecedented" and recognizes the significant constitutional problems created by Congress' decision to raise "the bar that covered jurisdictions must clear," even as "the conditions justifying that requirement have dramatically improved." Ante, at 2627. However one aggregates the data compiled by Congress, it cannot justify the considerable burdens created by § 5. As the Court aptly notes: "[N]o one can fairly say that [the record] shows anything approaching the 'pervasive,' 'flagrant,' 'widespread,' and 'rampant' discrimination *559 that faced Congress in 1965, and that clearly distinguished the covered jurisdictions from the rest of the Nation at that time." Ante, at 2629. Indeed, circumstances in the covered jurisdictions can no longer be characterized as "exceptional" or "unique." "The extensive pattern of discrimination that led the Court to previously uphold § 5 as enforcing the Fifteenth Amendment no longer exists." Northwest Austin, supra, at 226, 129 S.Ct. 2504 (THOMAS, J., concurring in judgment in part and dissenting in part). Section 5 is, thus, unconstitutional.
While the Court claims to "issue no holding on § 5 itself," ante, at 2631, its own opinion compellingly demonstrates that Congress has failed to justify " 'current burdens' " with a record demonstrating " 'current needs.' " See ante, at 2622 (quoting Northwest Austin, supra, at 203, 129 S.Ct. 2504). By leaving the inevitable conclusion unstated, the Court needlessly prolongs the demise of that provision. For the reasons stated in the Court's opinion, I would find § 5 unconstitutional.
Justice GINSBURG, with whom Justice BREYER, Justice SOTOMAYOR, and Justice KAGAN join, dissenting.
In the Court's view, the very success of § 5 of the Voting Rights Act demands its dormancy. Congress was of another mind. Recognizing that large progress has been made, Congress determined, based on a voluminous record, that the scourge of discrimination was not yet extirpated. The question this case presents is who decides whether, as currently operative, § 5 remains justifiable,[1] this Court, or a Congress charged with the obligation to enforce the post-Civil War Amendments "by appropriate legislation." With overwhelming support in both Houses, Congress concluded that, for two prime reasons, § 5 should continue in force, unabated. First, continuance would facilitate completion of the impressive gains thus far made; and second, continuance would *560 guard against backsliding. Those assessments were well within Congress' province to make and *2633 should elicit this Court's unstinting approbation.
I
"[V]oting discrimination still exists; no one doubts that." Ante, at 2619. But the Court today terminates the remedy that proved to be best suited to block that discrimination. The Voting Rights Act of 1965 (VRA) has worked to combat voting discrimination where other remedies had been tried and failed. Particularly effective is the VRA's requirement of federal preclearance for all changes to voting laws in the regions of the country with the most aggravated records of rank discrimination against minority voting rights.
A century after the Fourteenth and Fifteenth Amendments guaranteed citizens the right to vote free of discrimination on the basis of race, the "blight of racial discrimination in voting" continued to "infec[t] the electoral process in parts of our country." South Carolina v. Katzenbach, 383 U.S. 301, 308, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966). Early attempts to cope with this vile infection resembled battling the Hydra. Whenever one form of voting discrimination was identified and prohibited, others sprang up in its place. This Court repeatedly encountered the remarkable "variety and persistence" of laws disenfranchising minority citizens. Id., at 311, 86 S.Ct. 803. To take just one example, the Court, in 1927, held unconstitutional a Texas law barring black voters from participating in primary elections, Nixon v. Herndon, 273 U.S. 536, 541, 47 S.Ct. 446, 71 L.Ed. 759; in 1944, the Court struck down a "reenacted" and slightly altered version of the same law, Smith v. Allwright, 321 U.S. 649, 658, 64 S.Ct. 757, 88 L.Ed. 987; and in 1953, the Court once again confronted an attempt by Texas to "circumven[t]" the Fifteenth Amendment by adopting yet another variant of the all-white primary, Terry v. Adams, 345 U.S. 461, 469, 73 S.Ct. 809, 97 L.Ed. 1152.
*561 During this era, the Court recognized that discrimination against minority voters was a quintessentially political problem requiring a political solution. As Justice Holmes explained: If "the great mass of the white population intends to keep the blacks from voting," "relief from [that] great political wrong, if done, as alleged, by the people of a State and the State itself, must be given by them or by the legislative and political department of the government of the United States." Giles v. Harris, 189 U.S. 475, 488, 23 S.Ct. 639, 47 L.Ed. 909 (1903).
Congress learned from experience that laws targeting particular electoral practices or enabling case-by-case litigation were inadequate to the task. In the Civil Rights Acts of 1957, 1960, and 1964, Congress authorized and then expanded the power of "the Attorney General to seek injunctions against public and private interference with the right to vote on racial grounds." Katzenbach, 383 U.S., at 313, 86 S.Ct. 803. But circumstances reduced the ameliorative potential of these legislative Acts:
"Voting suits are unusually onerous to prepare, sometimes requiring as many as 6,000 man-hours spent combing through registration records in preparation for trial. Litigation has been exceedingly slow, in part because of the ample opportunities for delay afforded voting officials and others involved in the proceedings. Even when favorable decisions have finally been obtained, some of the States affected have merely switched to discriminatory devices not covered by the federal decrees or have enacted difficult new tests designed to prolong the existing disparity between white and Negro registration. Alternatively, certain local officials have defied *2634 and evaded court orders or have simply closed their registration offices to freeze the voting rolls." Id., at 314, 86 S.Ct. 803 (footnote omitted).
Patently, a new approach was needed.
*562 Answering that need, the Voting Rights Act became one of the most consequential, efficacious, and amply justified exercises of federal legislative power in our Nation's history. Requiring federal preclearance of changes in voting laws in the covered jurisdictions-those States and localities where opposition to the Constitution's commands were most virulent-the VRA provided a fit solution for minority voters as well as for States. Under the preclearance regime established by § 5 of the VRA, covered jurisdictions must submit proposed changes in voting laws or procedures to the Department of Justice (DOJ), which has 60 days to respond to the changes. 79 Stat. 439, codified at 42 U.S.C. § 1973c(a). A change will be approved unless DOJ finds it has "the purpose [or] ... the effect of denying or abridging the right to vote on account of race or color." Ibid. In the alternative, the covered jurisdiction may seek approval by a three-judge District Court in the District of Columbia.
After a century's failure to fulfill the promise of the Fourteenth and Fifteenth Amendments, passage of the VRA finally led to signal improvement on this front. "The Justice Department estimated that in the five years after [the VRA's] passage, almost as many blacks registered [to vote] in Alabama, Mississippi, Georgia, Louisiana, North Carolina, and South Carolina as in the entire century before 1965." Davidson, The Voting Rights Act: A Brief History, in Controversies in Minority Voting 7, 21 (B. Grofman & C. Davidson eds. 1992). And in assessing the overall effects of the VRA in 2006, Congress found that "[s]ignificant progress has been made in eliminating first generation barriers experienced by minority voters, including increased numbers of registered minority voters, minority voter turnout, and minority representation in Congress, State legislatures, and local elected offices. This progress is the direct result of the Voting Rights Act of 1965." Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and *563 Amendments Act of 2006 (hereinafter 2006 Reauthorization), § 2(b) (1), 120 Stat. 577. On that matter of cause and effects there can be no genuine doubt.
Although the VRA wrought dramatic changes in the realization of minority voting rights, the Act, to date, surely has not eliminated all vestiges of discrimination against the exercise of the franchise by minority citizens. Jurisdictions covered by the preclearance requirement continued to submit, in large numbers, proposed changes to voting laws that the Attorney General declined to approve, auguring that barriers to minority voting would quickly resurface were the preclearance remedy eliminated. City of Rome v. United States, 446 U.S. 156, 181, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980). Congress also found that as "registration and voting of minority citizens increas[ed], other measures may be resorted to which would dilute increasing minority voting strength." Ibid. (quoting H.R.Rep. No. 94-196, p. 10 (1975)). See also Shaw v. Reno, 509 U.S. 630, 640, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) ("[I]t soon became apparent that guaranteeing equal access to the polls would not suffice to root out other racially discriminatory voting practices" such as voting dilution). Efforts to reduce the impact of minority votes, in contrast to direct attempts to block access to the ballot, are aptly described as "second-generation barriers" to minority voting.
*2635 Second-generation barriers come in various forms. One of the blockages is racial gerrymandering, the redrawing of legislative districts in an "effort to segregate the races for purposes of voting." Id., at 642, 113 S.Ct. 2816. Another is adoption of a system of at-large voting in lieu of district-by-district voting in a city with a sizable black minority. By switching to at-large voting, the overall majority could control the election of each city council member, effectively eliminating the potency of the minority's votes. Grofman & Davidson, The Effect of Municipal Election Structure on Black Representation in Eight Southern States, in Quiet Revolution in the *564 South 301, 319 (C. Davidson & B. Grofman eds. 1994) (hereinafter Quiet Revolution). A similar effect could be achieved if the city engaged in discriminatory annexation by incorporating majority-white areas into city limits, thereby decreasing the effect of VRA-occasioned increases in black voting. Whatever the device employed, this Court has long recognized that vote dilution, when adopted with a discriminatory purpose, cuts down the right to vote as certainly as denial of access to the ballot. Shaw, 509 U.S., at 640-641, 113 S.Ct. 2816; Allen v. State Bd. of Elections, 393 U.S. 544, 569, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969) ; Reynolds v. Sims, 377 U.S. 533, 555, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). See also H.R.Rep. No. 109-478, p. 6 (2006) (although "[d]iscrimination today is more subtle than the visible methods used in 1965," "the effect and results are the same, namely a diminishing of the minority community's ability to fully participate in the electoral process and to elect their preferred candidates").
In response to evidence of these substituted barriers, Congress reauthorized the VRA for five years in 1970, for seven years in 1975, and for 25 years in 1982. Ante, at 2620 - 2621. Each time, this Court upheld the reauthorization as a valid exercise of congressional power. Ante, at 2620. As the 1982 reauthorization approached its 2007 expiration date, Congress again considered whether the VRA's preclearance mechanism remained an appropriate response to the problem of voting discrimination in covered jurisdictions.
Congress did not take this task lightly. Quite the opposite. The 109th Congress that took responsibility for the renewal started early and conscientiously. In October 2005, the House began extensive hearings, which continued into November and resumed in March 2006. S.Rep. No. 109-295, p. 2 (2006). In April 2006, the Senate followed suit, with hearings of its own. Ibid. In May 2006, the bills that became the VRA's reauthorization were introduced in both Houses. Ibid. The House held further hearings of considerable length, as did the Senate, which continued to hold hearings into June and July. H.R. Rep. 109-478, at 5 ;
*565 S. Rep. 109-295, at 3-4. In mid-July, the House considered and rejected four amendments, then passed the reauthorization by a vote of 390 yeas to 33 nays. 152 Cong. Rec. H5207 (July 13, 2006); Persily, The Promise and Pitfalls of the New Voting Rights Act, 117 Yale L.J. 174, 182-183 (2007) (hereinafter Persily). The bill was read and debated in the Senate, where it passed by a vote of 98 to 0. 152 Cong. Rec. S8012 (July 20, 2006). President Bush signed it a week later, on July 27, 2006, recognizing the need for "further work ... in the fight against injustice," and calling the reauthorization "an example of our continued commitment to a united America where every person is valued and treated with dignity and respect." 152 Cong. Rec. S8781 (Aug. 3, 2006).
In the long course of the legislative process, Congress "amassed a sizable record."
*2636 Northwest Austin Municipal Util. Dist. No. One v. Holder, 557 U.S. 193, 205, 129 S.Ct. 2504, 174 L.Ed.2d 140 (2009). See also 679 F.3d 848, 865-873 (C.A.D.C.2012) (describing the "extensive record" supporting Congress' determination that "serious and widespread intentional discrimination persisted in covered jurisdictions"). The House and Senate Judiciary Committees held 21 hearings, heard from scores of witnesses, received a number of investigative reports and other written documentation of continuing discrimination in covered jurisdictions. In all, the legislative record Congress compiled filled more than 15,000 pages. H.R. Rep. 109-478, at 5, 11-12 ; S. Rep. 109-295, at 2-4, 15. The compilation presents countless "examples of flagrant racial discrimination" since the last reauthorization; Congress also brought to light systematic evidence that "intentional racial discrimination in voting remains so serious and widespread in covered jurisdictions that section 5 preclearance is still needed." 679 F.3d, at 866.
After considering the full legislative record, Congress made the following findings: The VRA has directly caused significant progress in eliminating first-generation barriers to ballot access, leading to a marked increase in minority *566 voter registration and turnout and the number of minority elected officials. 2006 Reauthorization § 2(b)(1). But despite this progress, "second generation barriers constructed to prevent minority voters from fully participating in the electoral process" continued to exist, as well as racially polarized voting in the covered jurisdictions, which increased the political vulnerability of racial and language minorities in those jurisdictions. §§ 2(b)(2)-(3), 120 Stat. 577. Extensive "[e]vidence of continued discrimination," Congress concluded, "clearly show[ed] the continued need for Federal oversight" in covered jurisdictions. §§ 2(b)(4)-(5), id., at 577-578. The overall record demonstrated to the federal lawmakers that, "without the continuation of the Voting Rights Act of 1965 protections, racial and language minority citizens will be deprived of the opportunity to exercise their right to vote, or will have their votes diluted, undermining the significant gains made by minorities in the last 40 years." § 2(b)(9), id., at 578.
Based on these findings, Congress reauthorized preclearance for another 25 years, while also undertaking to reconsider the extension after 15 years to ensure that the provision was still necessary and effective. 42 U.S.C. § 1973b(a)(7), (8) (2006 ed., Supp. V). The question before the Court is whether Congress had the authority under the Constitution to act as it did.
II
In answering this question, the Court does not write on a clean slate. It is well established that Congress' judgment regarding exercise of its power to enforce the Fourteenth and Fifteenth Amendments warrants substantial deference. The VRA addresses the combination of race discrimination and the right to vote, which is "preservative of all rights." Yick Wo v. Hopkins, 118 U.S. 356, 370, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). When confronting the most constitutionally invidious form of discrimination, and the most fundamental right in our democratic system, Congress' power to act is at its height.
*567 The basis for this deference is firmly rooted in both constitutional text and precedent. The Fifteenth Amendment, which targets precisely and only racial discrimination in voting rights, states that, in this domain, "Congress shall have power to enforce this article by appropriate legislation."[2] In choosing this language, the *2637 Amendment's framers invoked Chief Justice Marshall's formulation of the scope of Congress' powers under the Necessary and Proper Clause:
"Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." McCulloch v. Maryland, 4 Wheat. 316, 421, 4 L.Ed. 579 (1819) (emphasis added).
It cannot tenably be maintained that the VRA, an Act of Congress adopted to shield the right to vote from racial discrimination, is inconsistent with the letter or spirit of the Fifteenth Amendment, or any provision of the Constitution read in light of the Civil War Amendments. Nowhere in today's opinion, or in Northwest Austin,[3] is there clear recognition of the transformative effect the Fifteenth Amendment aimed to achieve. Notably, "the Founders' first successful amendment told Congress that it could 'make no law' over a *568 certain domain"; in contrast, the Civil War Amendments used " language [that] authorized transformative new federal statutes to uproot all vestiges of unfreedom and inequality" and provided "sweeping enforcement powers ... to enact 'appropriate' legislation targeting state abuses." A. Amar, America's Constitution: A Biography 361, 363, 399 (2005). See also McConnell, Institutions and Interpretation: A Critique of City of Boerne v. Flores, 111 Harv. L.Rev. 153, 182 (1997) (quoting Civil War-era framer that "the remedy for the violation of the fourteenth and fifteenth amendments was expressly not left to the courts. The remedy was legislative.").
The stated purpose of the Civil War Amendments was to arm Congress with the power and authority to protect all persons within the Nation from violations of their rights by the States. In exercising that power, then, Congress may use "all means which are appropriate, which are plainly adapted" to the constitutional ends declared by these Amendments. McCulloch, 4 Wheat., at 421. So when Congress acts to enforce the right to vote free from racial discrimination, we ask not whether Congress has chosen the means most wise, but whether Congress has rationally selected means appropriate to a legitimate end. "It is not for us to review the congressional resolution of [the need for its chosen remedy]. It is enough that we be able to perceive a basis upon which the Congress might resolve the conflict as it did." Katzenbach v. Morgan, 384 U.S. 641, 653, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966).
Until today, in considering the constitutionality of the VRA, the Court has accorded Congress the full measure of respect its *2638 judgments in this domain should garner. South Carolina v. Katzenbach supplies the standard of review: "As against the reserved powers of the States, Congress may use any rational means to effectuate the constitutional prohibition of racial discrimination in voting." 383 U.S., at 324, 86 S.Ct. 803. Faced with subsequent reauthorizations of the VRA, the *569 Court has reaffirmed this standard. E.g., City of Rome, 446 U.S., at 178, 100 S.Ct. 1548. Today's Court does not purport to alter settled precedent establishing that the dispositive question is whether Congress has employed "rational means."
For three reasons, legislation re authorizing an existing statute is especially likely to satisfy the minimal requirements of the rational-basis test. First, when reauthorization is at issue, Congress has already assembled a legislative record justifying the initial legislation. Congress is entitled to consider that preexisting record as well as the record before it at the time of the vote on reauthorization. This is especially true where, as here, the Court has repeatedly affirmed the statute's constitutionality and Congress has adhered to the very model the Court has upheld. See id., at 174, 100 S.Ct. 1548 ("The appellants are asking us to do nothing less than overrule our decision in South Carolina v. Katzenbach ..., in which we upheld the constitutionality of the Act."); Lopez v. Monterey County, 525 U.S. 266, 283, 119 S.Ct. 693, 142 L.Ed.2d 728 (1999) (similar).
Second, the very fact that reauthorization is necessary arises because Congress has built a temporal limitation into the Act. It has pledged to review, after a span of years (first 15, then 25) and in light of contemporary evidence, the continued need for the VRA. Cf. Grutter v. Bollinger, 539 U.S. 306, 343, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003) (anticipating, but not guaranteeing, that, in 25 years, "the use of racial preferences [in higher education] will no longer be necessary").
Third, a reviewing court should expect the record supporting reauthorization to be less stark than the record originally made. Demand for a record of violations equivalent to the one earlier made would expose Congress to a catch-22. If the statute was working, there would be less evidence of discrimination, so opponents might argue that Congress should not be allowed to renew the statute. In contrast, if the statute was not working, there would be plenty of evidence of discrimination, but scant reason to renew a failed regulatory regime. See Persily 193-194.
*570 This is not to suggest that congressional power in this area is limitless. It is this Court's responsibility to ensure that Congress has used appropriate means. The question meet for judicial review is whether the chosen means are "adapted to carry out the objects the amendments have in view." Ex parte Virginia, 100 U.S. 339, 346, 25 L.Ed. 676 (1880). The Court's role, then, is not to substitute its judgment for that of Congress, but to determine whether the legislative record sufficed to show that "Congress could rationally have determined that [its chosen] provisions were appropriate methods." City of Rome, 446 U.S., at 176-177, 100 S.Ct. 1548.
In summary, the Constitution vests broad power in Congress to protect the right to vote, and in particular to combat racial discrimination in voting. This Court has repeatedly reaffirmed Congress' prerogative to use any rational means in exercise of its power in this area. And both precedent and logic dictate that the rational-means test should be easier to satisfy, and the burden on the statute's challenger should be higher, when what is at issue is the reauthorization of a remedy that the Court has previously affirmed, and that Congress found, from contemporary evidence, *2639 to be working to advance the legislature's legitimate objective.
III
The 2006 reauthorization of the Voting Rights Act fully satisfies the standard stated in McCulloch, 4 Wheat., at 421: Congress may choose any means "appropriate" and "plainly adapted to" a legitimate constitutional end. As we shall see, it is implausible to suggest otherwise.
A
I begin with the evidence on which Congress based its decision to continue the preclearance remedy. The surest way to evaluate whether that remedy remains in order is to see if preclearance is still effectively preventing discriminatory changes to voting laws. See City of Rome, 446 U.S., at 181, 100 S.Ct. 1548 (identifying "information on the number and types of *571 submissions made by covered jurisdictions and the number and nature of objections interposed by the Attorney General" as a primary basis for upholding the 1975 reauthorization). On that score, the record before Congress was huge. In fact, Congress found there were more DOJ objections between 1982 and 2004 (626) than there were between 1965 and the 1982 reauthorization (490). 1 Voting Rights Act: Evidence of Continued Need, Hearing before the Subcommittee on the Constitution of the House Committee on the Judiciary, 109th Cong., 2d Sess., p. 172 (2006) (hereinafter Evidence of Continued Need).
All told, between 1982 and 2006, DOJ objections blocked over 700 voting changes based on a determination that the changes were discriminatory. H.R.Rep. No. 109-478, at 21. Congress found that the majority of DOJ objections included findings of discriminatory intent, see 679 F.3d, at 867, and that the changes blocked by preclearance were "calculated decisions to keep minority voters from fully participating in the political process." H.R. Rep. 109-478, at 21 (2006), 2006 U.S.C.C.A.N. 618, 631. On top of that, over the same time period the DOJ and private plaintiffs succeeded in more than 100 actions to enforce the § 5 preclearance requirements. 1 Evidence of Continued Need 186, 250.
In addition to blocking proposed voting changes through preclearance, DOJ may request more information from a jurisdiction proposing a change. In turn, the jurisdiction may modify or withdraw the proposed change. The number of such modifications or withdrawals provides an indication of how many discriminatory proposals are deterred without need for formal objection. Congress received evidence that more than 800 proposed changes were altered or withdrawn since the last reauthorization in 1982. H.R.Rep. No. 109-478, at 40-41.[4] Congress also received empirical studies *572 finding that DOJ's requests for more information had a significant effect on the degree to which covered *2640 jurisdictions "compl[ied] with their obligatio[n]" to protect minority voting rights. 2 Evidence of Continued Need 2555.
Congress also received evidence that litigation under § 2 of the VRA was an inadequate substitute for preclearance in the covered jurisdictions. Litigation occurs only after the fact, when the illegal voting scheme has already been put in place and individuals have been elected pursuant to it, thereby gaining the advantages of incumbency. 1 Evidence of Continued Need 97. An illegal scheme might be in place for several election cycles before a § 2 plaintiff can gather sufficient evidence to challenge it. 1 Voting Rights Act: Section 5 of the Act-History, Scope, and Purpose: Hearing before the Subcommittee on the Constitution of the House Committee on the Judiciary, 109th Cong., 1st Sess., p. 92 (2005) (hereinafter Section 5 Hearing). And litigation places a heavy financial burden on minority voters. See id., at 84. Congress also received evidence that preclearance lessened the litigation burden on covered jurisdictions themselves, because the preclearance process is far less costly than defending against a § 2 claim, and clearance by DOJ substantially reduces the likelihood that a § 2 claim will be mounted. Reauthorizing the Voting Rights Act's Temporary Provisions: Policy Perspectives and Views From the Field: Hearing before the Subcommittee on the Constitution, Civil Rights and Property Rights of the Senate Committee on the Judiciary, 109th Cong., 2d Sess., *573 pp. 13, 120-121 (2006). See also Brief for States of New York, California, Mississippi, and North Carolina as Amici Curiae 8-9 (Section 5 "reduc[es] the likelihood that a jurisdiction will face costly and protracted Section 2 litigation").
The number of discriminatory changes blocked or deterred by the preclearance requirement suggests that the state of voting rights in the covered jurisdictions would have been significantly different absent this remedy. Surveying the type of changes stopped by the preclearance procedure conveys a sense of the extent to which § 5 continues to protect minority voting rights. Set out below are characteristic examples of changes blocked in the years leading up to the 2006 reauthorization:
• In 1995, Mississippi sought to reenact a dual voter registration system, "which was initially enacted in 1892 to disenfranchise Black voters," and for that reason, was struck down by a federal court in 1987. H.R.Rep. No. 109-478, at 39.
• Following the 2000 census, the City of Albany, Georgia, proposed a redistricting plan that DOJ found to be "designed with the purpose to limit and retrogress the increased black voting strength ... in the city as a whole." Id., at 37 (internal quotation marks omitted).
• In 2001, the mayor and all-white five-member Board of Aldermen of Kilmichael, Mississippi, abruptly canceled the town's election after "an unprecedented number" of African-American candidates announced they were running for office. DOJ required an election, and the town elected its first black mayor and three black aldermen. Id., at 36-37.
• In 2006, this Court found that Texas' attempt to redraw a congressional district to reduce the strength of Latino voters bore "the mark of intentional discrimination that could give rise to an equal protection violation," and ordered the district redrawn in compliance with the VRA.
*574 League of United Latin American Citizens v. Perry, 548 U.S. 399, 440 [126 S.Ct. 2594, 165 L.Ed.2d 609] (2006). In response, *2641 Texas sought to undermine this Court's order by curtailing early voting in the district, but was blocked by an action to enforce the § 5 preclearance requirement. See Order in League of United Latin American Citizens v. Texas, No. 06-cv-1046 (WD Tex.), Doc. 8.
• In 2003, after African-Americans won a majority of the seats on the school board for the first time in history, Charleston County, South Carolina, proposed an at-large voting mechanism for the board. The proposal, made without consulting any of the African-American members of the school board, was found to be an " 'exact replica' " of an earlier voting scheme that, a federal court had determined, violated the VRA. 811 F.Supp.2d 424, 483 (D.D.C.2011). See also S.Rep. No. 109-295, at 309. DOJ invoked § 5 to block the proposal.
• In 1993, the City of Millen, Georgia, proposed to delay the election in a majority-black district by two years, leaving that district without representation on the city council while the neighboring majority-white district would have three representatives. 1 Section 5 Hearing 744. DOJ blocked the proposal. The county then sought to move a polling place from a predominantly black neighborhood in the city to an inaccessible location in a predominantly white neighborhood outside city limits. Id., at 816.
• In 2004, Waller County, Texas, threatened to prosecute two black students after they announced their intention to run for office. The county then attempted to reduce the availability of early voting in that election at polling places near a historically black university. 679 F.3d, at 865-866.
• In 1990, Dallas County, Alabama, whose county seat is the City of Selma, sought to purge its voter rolls of many black voters. DOJ rejected the purge as discriminatory, *575 noting that it would have disqualified many citizens from voting "simply because they failed to pick up or return a voter update form, when there was no valid requirement that they do so." 1 Section 5 Hearing 356.
These examples, and scores more like them, fill the pages of the legislative record. The evidence was indeed sufficient to support Congress' conclusion that "racial discrimination in voting in covered jurisdictions [remained] serious and pervasive." 679 F.3d, at 865.[5]
Congress further received evidence indicating that formal requests of the kind set out above represented only the tip of the iceberg. There was what one commentator described as an "avalanche of case studies of voting rights violations in the covered jurisdictions," ranging from "outright intimidation and violence against minority voters" to "more subtle forms of voting rights deprivations." Persily 202 *2642 (footnote omitted). This evidence gave Congress ever more reason to conclude that the time had not yet come for relaxed vigilance against the scourge of race discrimination in voting.
True, conditions in the South have impressively improved since passage of the Voting Rights Act. Congress noted this improvement and found that the VRA was the driving force behind it. 2006 Reauthorization § 2(b)(1). But Congress also found that voting discrimination had evolved into *576 subtler second-generation barriers, and that eliminating preclearance would risk loss of the gains that had been made. §§ 2(b)(2), (9). Concerns of this order, the Court previously found, gave Congress adequate cause to reauthorize the VRA. City of Rome, 446 U.S., at 180-182, 100 S.Ct. 1548 (congressional reauthorization of the preclearance requirement was justified based on "the number and nature of objections interposed by the Attorney General" since the prior reauthorization; extension was "necessary to preserve the limited and fragile achievements of the Act and to promote further amelioration of voting discrimination") (internal quotation marks omitted). Facing such evidence then, the Court expressly rejected the argument that disparities in voter turnout and number of elected officials were the only metrics capable of justifying reauthorization of the VRA. Ibid.
B
I turn next to the evidence on which Congress based its decision to reauthorize the coverage formula in § 4(b). Because Congress did not alter the coverage formula, the same jurisdictions previously subject to preclearance continue to be covered by this remedy. The evidence just described, of preclearance's continuing efficacy in blocking constitutional violations in the covered jurisdictions, itself grounded Congress' conclusion that the remedy should be retained for those jurisdictions.
There is no question, moreover, that the covered jurisdictions have a unique history of problems with racial discrimination in voting. Ante, at 2624 - 2625. Consideration of this long history, still in living memory, was altogether appropriate. The Court criticizes Congress for failing to recognize that "history did not end in 1965." Ante, at 2628. But the Court ignores that "what's past is prologue." W. Shakespeare, The Tempest, act 2, sc. 1. And "[t]hose who cannot remember the past are condemned to repeat it." 1 G. Santayana, The Life of Reason 284 (1905). Congress was *577 especially mindful of the need to reinforce the gains already made and to prevent backsliding. 2006 Reauthorization § 2(b)(9).
Of particular importance, even after 40 years and thousands of discriminatory changes blocked by preclearance, conditions in the covered jurisdictions demonstrated that the formula was still justified by "current needs." Northwest Austin, 557 U.S., at 203, 129 S.Ct. 2504.
Congress learned of these conditions through a report, known as the Katz study, that looked at § 2 suits between 1982 and 2004. To Examine the Impact and Effectiveness of the Voting Rights Act: Hearing before the Subcommittee on the Constitution of the House Committee on the Judiciary, 109th Cong., 1st Sess., pp. 964-1124 (2005) (hereinafter Impact and Effectiveness). Because the private right of action authorized by § 2 of the VRA applies nationwide, a comparison of § 2 lawsuits in covered and noncovered jurisdictions provides an appropriate yardstick for measuring differences between covered and noncovered jurisdictions. If differences in the risk of voting discrimination between covered and noncovered jurisdictions had disappeared, one would *2643 expect that the rate of successful § 2 lawsuits would be roughly the same in both areas.[6] The study's findings, however, indicated that racial discrimination in voting remains "concentrated in the jurisdictions singled out for preclearance." Northwest Austin, 557 U.S., at 203, 129 S.Ct. 2504.
Although covered jurisdictions account for less than 25 percent of the country's population, the Katz study revealed that they accounted for 56 percent of successful § 2 litigation since 1982. Impact and Effectiveness 974. Controlling for population, there were nearly four times as many successful § 2 cases in covered jurisdictions as there were in noncovered *578 jurisdictions. 679 F.3d, at 874. The Katz study further found that § 2 lawsuits are more likely to succeed when they are filed in covered jurisdictions than in noncovered jurisdictions. Impact and Effectiveness 974. From these findings-ignored by the Court-Congress reasonably concluded that the coverage formula continues to identify the jurisdictions of greatest concern.
The evidence before Congress, furthermore, indicated that voting in the covered jurisdictions was more racially polarized than elsewhere in the country. H.R.Rep. No. 109-478, at 34-35. While racially polarized voting alone does not signal a constitutional violation, it is a factor that increases the vulnerability of racial minorities to discriminatory changes in voting law. The reason is twofold. First, racial polarization means that racial minorities are at risk of being systematically outvoted and having their interests underrepresented in legislatures. Second, "when political preferences fall along racial lines, the natural inclinations of incumbents and ruling parties to entrench themselves have predictable racial effects. Under circumstances of severe racial polarization, efforts to gain political advantage translate into race-specific disadvantages." Ansolabehere, Persily, & Stewart, Regional Differences in Racial Polarization in the 2012 Presidential Election: Implications for the Constitutionality of Section 5 of the Voting Rights Act, 126 Harv. L.Rev. Forum 205, 209 (2013).
In other words, a governing political coalition has an incentive to prevent changes in the existing balance of voting power. When voting is racially polarized, efforts by the ruling party to pursue that incentive "will inevitably discriminate against a racial group." Ibid. Just as buildings in California have a greater need to be earthquake-proofed, places where there is greater racial polarization in voting have a greater need for prophylactic measures to prevent purposeful race discrimination. This point was understood by Congress and is well recognized in the academic *579 literature. See 2006 Reauthorization § 2(b)(3), 120 Stat. 577 ("The continued evidence of racially polarized voting in each of the jurisdictions covered by the [preclearance requirement] demonstrates that racial and language minorities remain politically vulnerable"); H.R.Rep. No. 109-478, at 35 (2006), 2006 U.S.C.C.A.N. 618; Davidson, The Recent Evolution of Voting Rights Law Affecting Racial and Language Minorities, in Quiet Revolution 21, 22.
The case for retaining a coverage formula that met needs on the ground was therefore solid. Congress might have been charged with rigidity had it afforded covered *2644 jurisdictions no way out or ignored jurisdictions that needed superintendence. Congress, however, responded to this concern. Critical components of the congressional design are the statutory provisions allowing jurisdictions to "bail out" of preclearance, and for court-ordered "bail ins." See Northwest Austin, 557 U.S., at 199, 129 S.Ct. 2504. The VRA permits a jurisdiction to bail out by showing that it has complied with the Act for ten years, and has engaged in efforts to eliminate intimidation and harassment of voters. 42 U.S.C. § 1973b(a) (2006 ed. and Supp. V). It also authorizes a court to subject a noncovered jurisdiction to federal preclearance upon finding that violations of the Fourteenth and Fifteenth Amendments have occurred there. § 1973a(c) (2006 ed.).
Congress was satisfied that the VRA's bailout mechanism provided an effective means of adjusting the VRA's coverage over time. H.R.Rep. No. 109-478, at 25 (the success of bailout "illustrates that: (1) covered status is neither permanent nor over-broad; and (2) covered status has been and continues to be within the control of the jurisdiction such that those jurisdictions that have a genuinely clean record and want to terminate coverage have the ability to do so"). Nearly 200 jurisdictions have successfully bailed out of the preclearance requirement, and DOJ has consented to every bailout application filed by an eligible jurisdiction since the current bailout procedure became effective in 1984. Brief for Federal Respondent 54. The bail-in mechanism has also *580 worked. Several jurisdictions have been subject to federal preclearance by court orders, including the States of New Mexico and Arkansas. App. to Brief for Federal Respondent 1a-3a.
This experience exposes the inaccuracy of the Court's portrayal of the Act as static, unchanged since 1965. Congress designed the VRA to be a dynamic statute, capable of adjusting to changing conditions. True, many covered jurisdictions have not been able to bail out due to recent acts of noncompliance with the VRA, but that truth reinforces the congressional judgment that these jurisdictions were rightfully subject to preclearance, and ought to remain under that regime.
IV
Congress approached the 2006 reauthorization of the VRA with great care and seriousness. The same cannot be said of the Court's opinion today. The Court makes no genuine attempt to engage with the massive legislative record that Congress assembled. Instead, it relies on increases in voter registration and turnout as if that were the whole story. See supra, at 2641 - 2642. Without even identifying a standard of review, the Court dismissively brushes off arguments based on "data from the record," and declines to enter the "debat [e about] what [the] record shows." Ante, at 2629. One would expect more from an opinion striking at the heart of the Nation's signal piece of civil-rights legislation.
I note the most disturbing lapses. First, by what right, given its usual restraint, does the Court even address Shelby County's facial challenge to the VRA? Second, the Court veers away from controlling precedent regarding the "equal sovereignty" doctrine without even acknowledging that it is doing so. Third, hardly showing the respect ordinarily paid when Congress acts to implement the Civil War Amendments, and as just stressed, the Court does not even deign to grapple with the legislative record.
*581 A
Shelby County launched a purely facial challenge to the VRA's 2006 reauthorization.
*2645 "A facial challenge to a legislative Act," the Court has other times said, "is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).
"[U]nder our constitutional system[,] courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws." Broadrick v. Oklahoma, 413 U.S. 601, 610-611, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). Instead, the "judicial Power" is limited to deciding particular "Cases" and "Controversies." U.S. Const., Art. III, § 2. "Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." Broadrick, 413 U.S., at 610, 93 S.Ct. 2908. Yet the Court's opinion in this case contains not a word explaining why Congress lacks the power to subject to preclearance the particular plaintiff that initiated this lawsuit-Shelby County, Alabama. The reason for the Court's silence is apparent, for as applied to Shelby County, the VRA's preclearance requirement is hardly contestable.
Alabama is home to Selma, site of the "Bloody Sunday" beatings of civil-rights demonstrators that served as the catalyst for the VRA's enactment. Following those events, Martin Luther King, Jr., led a march from Selma to Montgomery, Alabama's capital, where he called for passage of the VRA. If the Act passed, he foresaw, progress could be made even in Alabama, but there had to be a steadfast national commitment to see the task through to completion. In King's words, "the arc of the moral universe is long, but it bends toward justice." G. May, Bending Toward Justice:
*582 The Voting Rights Act and the Transformation of American Democracy 144 (2013).
History has proved King right. Although circumstances in Alabama have changed, serious concerns remain. Between 1982 and 2005, Alabama had one of the highest rates of successful § 2 suits, second only to its VRA-covered neighbor Mississippi. 679 F.3d, at 897 (Williams, J., dissenting). In other words, even while subject to the restraining effect of § 5, Alabama was found to have "deni[ed] or abridge[d]" voting rights "on account of race or color" more frequently than nearly all other States in the Union. 42 U.S.C. § 1973(a). This fact prompted the dissenting judge below to concede that "a more narrowly tailored coverage formula" capturing Alabama and a handful of other jurisdictions with an established track record of racial discrimination in voting "might be defensible." 679 F.3d, at 897 (opinion of Williams, J.). That is an understatement. Alabama's sorry history of § 2 violations alone provides sufficient justification for Congress' determination in 2006 that the State should remain subject to § 5's preclearance requirement.[7]
*2646 A few examples suffice to demonstrate that, at least in Alabama, the "current burdens" imposed by § 5's preclearance requirement are "justified by current needs." Northwest Austin, 557 U.S., at 203, 129 S.Ct. 2504. In the interim between the VRA's 1982 and 2006 reauthorizations, this Court twice confronted purposeful racial discrimination in Alabama. In Pleasant Grove v. United States, 479 U.S. 462, 107 S.Ct. 794, 93 L.Ed.2d 866 (1987), the Court held that Pleasant Grove-a city in Jefferson County, Shelby County's neighbor-engaged in purposeful *583 discrimination by annexing all-white areas while rejecting the annexation request of an adjacent black neighborhood. The city had "shown unambiguous opposition to racial integration, both before and after the passage of the federal civil rights laws," and its strategic annexations appeared to be an attempt "to provide for the growth of a monolithic white voting block" for "the impermissible purpose of minimizing future black voting strength." Id., at 465, 471-472, 107 S.Ct. 794.
Two years before Pleasant Grove, the Court in Hunter v. Underwood, 471 U.S. 222, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985), struck down a provision of the Alabama Constitution that prohibited individuals convicted of misdemeanor offenses "involving moral turpitude" from voting. Id., at 223, 105 S.Ct. 1916 (internal quotation marks omitted). The provision violated the Fourteenth Amendment's Equal Protection Clause, the Court unanimously concluded, because "its original enactment was motivated by a desire to discriminate against blacks on account of race[,] and the [provision] continues to this day to have that effect." Id., at 233, 105 S.Ct. 1916.
Pleasant Grove and Hunter were not anomalies. In 1986, a Federal District Judge concluded that the at-large election systems in several Alabama counties violated § 2. Dillard v. Crenshaw Cty., 640 F.Supp. 1347, 1354-1363 (M.D.Ala.1986). Summarizing its findings, the court stated that "[f]rom the late 1800's through the present, [Alabama] has consistently erected barriers to keep black persons from full and equal participation in the social, economic, and political life of the state." Id., at 1360.
The Dillard litigation ultimately expanded to include 183 cities, counties, and school boards employing discriminatory at-large election systems. Dillard v. Baldwin Cty. Bd. of Ed., 686 F.Supp. 1459, 1461 (M.D.Ala.1988). One of those defendants was Shelby County, which eventually signed a consent decree to resolve the claims against it. See Dillard v. Crenshaw Cty., 748 F.Supp. 819 (M.D.Ala.1990).
Although the Dillard litigation resulted in overhauls of numerous electoral systems tainted by racial discrimination, concerns about backsliding persist. In 2008, for example, *584 the city of Calera, located in Shelby County, requested preclearance of a redistricting plan that "would have eliminated the city's sole majority-black district, which had been created pursuant to the consent decree in Dillard ." 811 F.Supp.2d 424, 443 (D.D.C.2011). Although DOJ objected to the plan, Calera forged ahead with elections based on the unprecleared voting changes, resulting in the defeat of the incumbent African-American councilman who represented the former majority-black district. Ibid. The city's defiance required DOJ to bring a § 5 enforcement action that ultimately yielded appropriate redress, including restoration of the majority-black district. Ibid. ; Brief for Respondent-Intervenors Earl Cunningham et al. 20.
A recent FBI investigation provides a further window into the persistence of racial discrimination in state politics. See *2647 United States v. McGregor, 824 F.Supp.2d 1339, 1344-1348 (M.D.Ala.2011). Recording devices worn by state legislators cooperating with the FBI's investigation captured conversations between members of the state legislature and their political allies. The recorded conversations are shocking. Members of the state Senate derisively refer to African-Americans as "Aborigines" and talk openly of their aim to quash a particular gambling-related referendum because the referendum, if placed on the ballot, might increase African-American voter turnout. Id., at 1345-1346 (internal quotation marks omitted). See also id., at 1345 (legislators and their allies expressed concern that if the referendum were placed on the ballot, " '[e]very black, every illiterate' would be 'bused [to the polls] on HUD financed buses' "). These conversations occurred not in the 1870's, or even in the 1960's, they took place in 2010. Id., at 1344-1345. The District Judge presiding over the criminal trial at which the recorded conversations were introduced commented that the "recordings represent compelling evidence that political exclusion through racism remains a real and enduring problem" in Alabama. *585 Id., at 1347. Racist sentiments, the judge observed, "remain regrettably entrenched in the high echelons of state government." Ibid.
These recent episodes forcefully demonstrate that § 5's preclearance requirement is constitutional as applied to Alabama and its political subdivisions.[8] And under our case law, that conclusion should suffice to resolve this case. See United States v. Raines, 362 U.S. 17, 24-25, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960) ("[I]f the complaint here called for an application of the statute clearly constitutional under the Fifteenth Amendment, that should have been an end to the question of constitutionality."). See also Nevada Dept. of Human Resources v. Hibbs, 538 U.S. 721, 743, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003) (SCALIA, J., dissenting) (where, as here, a state or local government raises a facial challenge to a federal statute on the ground that it exceeds Congress' enforcement powers under the Civil War Amendments, the challenge fails if the opposing party is able to show that the statute "could constitutionally be applied to some jurisdictions").
This Court has consistently rejected constitutional challenges to legislation enacted pursuant to Congress' enforcement powers under the Civil War Amendments upon finding that the legislation was constitutional as applied to the particular set of circumstances before the Court. See United States v. Georgia, 546 U.S. 151, 159, 126 S.Ct. 877, 163 L.Ed.2d 650 (2006) (Title II of the Americans with Disabilities Act of 1990 (ADA) validly abrogates state sovereign immunity "insofar as [it] creates a private cause of action ... for conduct that actually violates the Fourteenth Amendment"); Tennessee v. Lane, 541 U.S. 509, 530-534, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004) (Title II of the ADA is constitutional "as it applies to the class of cases implicating the fundamental right of access to the courts");
*586 Raines, 362 U.S., at 24-26, 80 S.Ct. 519 (federal statute proscribing deprivations of the right to vote based on race was constitutional as applied to the state officials before the Court, even if it could not constitutionally be applied to other parties). A similar approach is warranted here.[9]
*2648 The VRA's exceptionally broad severability provision makes it particularly inappropriate for the Court to allow Shelby County to mount a facial challenge to §§ 4(b) and 5 of the VRA, even though application of those provisions to the county falls well within the bounds of Congress' legislative authority. The severability provision states:
"If any provision of [this Act] or the application thereof to any person or circumstances is held invalid, the remainder of [the Act] and the application of the provision to other persons not similarly situated or to other circumstances shall not be affected thereby." 42 U.S.C. § 1973p.
In other words, even if the VRA could not constitutionally be applied to certain States-e.g., Arizona and Alaska, see ante, at 2622 - § 1973p calls for those unconstitutional applications to be severed, leaving the Act in place for juris-dictions as to which its application does not transgress constitutional limits.
Nevertheless, the Court suggests that limiting the jurisdictional scope of the VRA in an appropriate case would be "to try our hand at updating the statute." Ante, at 2629.
*587 Just last Term, however, the Court rejected this very argument when addressing a materially identical severability provision, explaining that such a provision is "Congress' explicit textual instruction to leave unaffected the remainder of [the Act]" if any particular " application is unconstitutional." National Federation of Independent Business v. Sebelius, 567 U.S. ----, ----, 132 S.Ct. 2566, 2639, 183 L.Ed.2d 450 (2012) (plurality opinion) (internal quotation marks omitted); id., at ----, 132 S.Ct., at 2641-2642 (GINSBURG, J., concurring in part, concurring in judgment in part, and dissenting in part) (slip op., at 60) (agreeing with the plurality's severability analysis). See also Raines, 362 U.S., at 23, 80 S.Ct. 519 (a statute capable of some constitutional applications may nonetheless be susceptible to a facial challenge only in "that rarest of cases where this Court can justifiably think itself able confidently to discern that Congress would not have desired its legislation to stand at all unless it could validly stand in its every application"). Leaping to resolve Shelby County's facial challenge without considering whether application of the VRA to Shelby County is constitutional, or even addressing the VRA's severability provision, the Court's opinion can hardly be described as an exemplar of restrained and moderate decisionmaking. Quite the opposite. Hubris is a fit word for today's demolition of the VRA.
B
The Court stops any application of § 5 by holding that § 4(b)'s coverage formula is unconstitutional. It pins this result, in large measure, to "the fundamental principle of equal sovereignty." Ante, at 2623 - 2624, 2630. In Katzenbach, however, the Court held, in no uncertain terms, that the principle "applies only to the terms upon which States are admitted to the Union, and not to the remedies for local evils which have subsequently appeared." 383 U.S., at 328-329, 86 S.Ct. 803 (emphasis added).
*2649 Katzenbach, the Court acknowledges, "rejected the notion that the [equal sovereignty] principle operate[s] as a bar on *588 differential treatment outside [the] context [of the admission of new States]." Ante, at 2623 - 2624 (citing 383 U.S., at 328-329, 86 S.Ct. 803) (emphasis omitted). But the Court clouds that once clear understanding by citing dictum from Northwest Austin to convey that the principle of equal sovereignty "remains highly pertinent in assessing subsequent disparate treatment of States." Ante, at 2624 (citing 557 U.S., at 203, 129 S.Ct. 2504). See also ante, at 2630 (relying on Northwest Austin 's"emphasis on [the] significance" of the equal-sovereignty principle). If the Court is suggesting that dictum in Northwest Austin silently overruled Katzenbach 's limitation of the equal sovereignty doctrine to "the admission of new States," the suggestion is untenable. Northwest Austin cited Katzenbach 's holding in the course of declining to decide whether the VRA was constitutional or even what standard of review applied to the question. 557 U.S., at 203-204, 129 S.Ct. 2504. In today's decision, the Court ratchets up what was pure dictum in Northwest Austin, attributing breadth to the equal sovereignty principle in flat contradiction of Katzenbach . The Court does so with nary an explanation of why it finds Katzenbach wrong, let alone any discussion of whether stare decisis nonetheless counsels adherence to Katzenbach 's ruling on the limited "significance" of the equal sovereignty principle.
Today's unprecedented extension of the equal sovereignty principle outside its proper domain-the admission of new States-is capable of much mischief. Federal statutes that treat States disparately are hardly novelties. See, e.g., 28 U.S.C. § 3704 (no State may operate or permit a sports-related gambling scheme, unless that State conducted such a scheme "at any time during the period beginning January 1, 1976, and ending August 31, 1990"); 26 U.S.C. § 142(l ) (EPA required to locate green building project in a State meeting specified population criteria); 42 U.S.C. § 3796bb (at least 50 percent of rural drug enforcement assistance funding must be allocated to States with "a population density of fifty-two or fewer persons per *589 square mile or a State in which the largest county has fewer than one hundred and fifty thousand people, based on the decennial census of 1990 through fiscal year 1997"); §§ 13925, 13971 (similar population criteria for funding to combat rural domestic violence); § 10136 (specifying rules applicable to Nevada's Yucca Mountain nuclear waste site, and providing that " [n]o State, other than the State of Nevada, may receive financial assistance under this subsection after December 22, 1987"). Do such provisions remain safe given the Court's expansion of equal sovereignty's sway?
Of gravest concern, Congress relied on our pathmarking Katzenbach decision in each reauthorization of the VRA. It had every reason to believe that the Act's limited geographical scope would weigh in favor of, not against, the Act's constitutionality. See, e.g., United States v. Morrison, 529 U.S. 598, 626-627, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) (confining preclearance regime to States with a record of discrimination bolstered the VRA's constitutionality). Congress could hardly have foreseen that the VRA's limited geographic reach would render the Act constitutionally suspect. See Persily 195 ("[S]upporters of the Act sought to develop an evidentiary record for the principal purpose of explaining why the covered jurisdictions should remain covered, rather than justifying the coverage of certain jurisdictions but not others.").
In the Court's conception, it appears, defenders of the VRA could not prevail *2650 upon showing what the record overwhelmingly bears out, i.e., that there is a need for continuing the preclearance regime in covered States. In addition, the defenders would have to disprove the existence of a comparable need elsewhere. See Tr. of Oral Arg. 61-62 (suggesting that proof of egregious episodes of racial discrimination in covered jurisdictions would not suffice to carry the day for the VRA, unless such episodes are shown to be absent elsewhere). I am aware of no precedent for imposing such a double burden on defenders of legislation. *590 C
The Court has time and again declined to upset legislation of this genre unless there was no or almost no evidence of unconstitutional action by States. See, e.g., City of Boerne v. Flores, 521 U.S. 507, 530, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) (legislative record "mention[ed] no episodes [of the kind the legislation aimed to check] occurring in the past 40 years"). No such claim can be made about the congressional record for the 2006 VRA reauthorization. Given a record replete with examples of denial or abridgment of a paramount federal right, the Court should have left the matter where it belongs: in Congress' bailiwick.
Instead, the Court strikes § 4(b)'s coverage provision because, in its view, the provision is not based on "current conditions." Ante, at 2627. It discounts, however, that one such condition was the preclearance remedy in place in the covered jurisdictions, a remedy Congress designed both to catch discrimination before it causes harm, and to guard against return to old ways. 2006 Reauthorization § 2(b)(3), (9). Volumes of evidence supported Congress' determination that the prospect of retrogression was real. Throwing out preclearance when it has worked and is continuing to work to stop discriminatory changes is like throwing away your umbrella in a rainstorm because you are not getting wet.
But, the Court insists, the coverage formula is no good; it is based on "decades-old data and eradicated practices." Ante, at 2627. Even if the legislative record shows, as engaging with it would reveal, that the formula accurately identifies the jurisdictions with the worst conditions of voting discrimination, that is of no moment, as the Court sees it. Congress, the Court decrees, must "star[t] from scratch." Ante, at 2630. I do not see why that should be so.
Congress' chore was different in 1965 than it was in 2006. In 1965, there were a "small number of States ... which in most instances were familiar to Congress by name," on which Congress fixed its attention.
*591 Katzenbach, 383 U.S., at 328, 86 S.Ct. 803. In drafting the coverage formula, " Congress began work with reliable evidence of actual voting discrimination in a great majority of the States" it sought to target. Id., at 329, 86 S.Ct. 803."The formula [Congress] eventually evolved to describe these areas" also captured a few States that had not been the subject of congressional factfinding. Ibid. Nevertheless, the Court upheld the formula in its entirety, finding it fair "to infer a significant danger of the evil" in all places the formula covered. Ibid.
The situation Congress faced in 2006, when it took up re authorization of the coverage formula, was not the same. By then, the formula had been in effect for many years, and all of the jurisdictions covered by it were "familiar to Congress by name." Id., at 328, 86 S.Ct. 803. The question before Congress: Was there still a sufficient basis to support continued application of the preclearance remedy in each of those already-identified places? There was at that point no chance that the *2651 formula might inadvertently sweep in new areas that were not the subject of congressional findings. And Congress could determine from the record whether the jurisdictions captured by the coverage formula still belonged under the preclearance regime. If they did, there was no need to alter the formula. That is why the Court, in addressing prior reauthorizations of the VRA, did not question the continuing "relevance" of the formula.
Consider once again the components of the record before Congress in 2006. The coverage provision identified a known list of places with an undisputed history of serious problems with racial discrimination in voting. Recent evidence relating to Alabama and its counties was there for all to see. Multiple Supreme Court decisions had upheld the coverage provision, most recently in 1999. There was extensive evidence that, due to the preclearance mechanism, conditions in the covered jurisdictions had notably improved. And there was evidence that preclearance was still having a substantial real-world effect, having stopped hundreds of *592 discriminatory voting changes in the covered jurisdictions since the last reauthorization. In addition, there was evidence that racial polarization in voting was higher in covered jurisdictions than elsewhere, increasing the vulnerability of minority citizens in those jurisdictions. And countless witnesses, reports, and case studies documented continuing problems with voting discrimination in those jurisdictions. In light of this record, Congress had more than a reasonable basis to conclude that the existing coverage formula was not out of sync with conditions on the ground in covered areas. And certainly Shelby County was no candidate for release through the mechanism Congress provided. See supra, at 2643 - 2645, 2646 - 2647.
The Court holds § 4(b) invalid on the ground that it is "irrational to base coverage on the use of voting tests 40 years ago, when such tests have been illegal since that time." Ante, at 2631. But the Court disregards what Congress set about to do in enacting the VRA. That extraordinary legislation scarcely stopped at the particular tests and devices that happened to exist in 1965. The grand aim of the Act is to secure to all in our polity equal citizenship stature, a voice in our democracy undiluted by race. As the record for the 2006 reauthorization makes abundantly clear, second-generation barriers to minority voting rights have emerged in the covered jurisdictions as attempted substitutes for the first-generation barriers that originally triggered preclearance in those jurisdictions. See supra, at 2634 - 2635, 2636, 2640 - 2641.
The sad irony of today's decision lies in its utter failure to grasp why the VRA has proven effective. The Court appears to believe that the VRA's success in eliminating the specific devices extant in 1965 means that preclearance is no longer needed. Ante, at 2629 - 2630, 2630 - 2631. With that belief, and the argument derived from it, history repeats itself. The same assumption-that the problem could be solved when particular methods of voting discrimination are *593 identified and eliminated-was indulged and proved wrong repeatedly prior to the VRA's enactment. Unlike prior statutes, which singled out particular tests or devices, the VRA is grounded in Congress' recognition of the "variety and persistence" of measures designed to impair minority voting rights. Katzenbach, 383 U.S., at 311, 86 S.Ct. 803;supra, at 2633. In truth, the evolution of voting discrimination into more subtle second-generation barriers is powerful evidence that a remedy as effective as preclearance remains vital to protect minority voting rights and prevent backsliding.
Beyond question, the VRA is no ordinary legislation. It is extraordinary because *2652 Congress embarked on a mission long delayed and of extraordinary importance: to realize the purpose and promise of the Fifteenth Amendment. For a half century, a concerted effort has been made to end racial discrimination in voting. Thanks to the Voting Rights Act, progress once the subject of a dream has been achieved and continues to be made.
The record supporting the 2006 reauthorization of the VRA is also extraordinary. It was described by the Chairman of the House Judiciary Committee as "one of the most extensive considerations of any piece of legislation that the United States Congress has dealt with in the 27 & half; years" he had served in the House. 152 Cong. Rec. H5143 (July 13, 2006) (statement of Rep. Sensenbrenner). After exhaustive evidence-gathering and deliberative process, Congress reauthorized the VRA, including the coverage provision, with overwhelming bipartisan support. It was the judgment of Congress that "40 years has not been a sufficient amount of time to eliminate the vestiges of discrimination following nearly 100 years of disregard for the dictates of the 15th amendment and to ensure that the right of all citizens to vote is protected as guaranteed by the Constitution." 2006 Reauthorization § 2(b)(7), 120 Stat. 577. That determination of the body empowered to enforce the Civil War Amendments "by appropriate legislation" merits this Court's *594 utmost respect. In my judgment, the Court errs egregiously by overriding Congress' decision.
* * *
For the reasons stated, I would affirm the judgment of the Court of Appeals.

The Court purports to declare unconstitutional only the coverage formula set out in § 4(b). See ante, at 2631. But without that formula, § 5 is immobilized.

The Constitution uses the words "right to vote" in five separate places: the Fourteenth, Fifteenth, Nineteenth, Twenty-Fourth, and Twenty-Sixth Amendments. Each of these Amendments contains the same broad empowerment of Congress to enact "appropriate legislation" to enforce the protected right. The implication is unmistakable: Under our constitutional structure, Congress holds the lead rein in making the right to vote equally real for all U.S. citizens. These Amendments are in line with the special role assigned to Congress in protecting the integrity of the democratic process in federal elections. U.S. Const., Art. I, § 4 ("[T]he Congress may at any time by Law make or alter" regulations concerning the "Times, Places and Manner of holding Elections for Senators and Representatives."); Arizona v. Inter Tribal Council of Ariz., Inc., --- U.S., ----, ---- - ----, 133 S.Ct. 2247, ---- - ----, 186L.Ed.2d 239 (2013).

Acknowledging the existence of "serious constitutional questions," see ante, at 2630 (internal quotation marks omitted), does not suggest how those questions should be answered.

This number includes only changes actually proposed. Congress also received evidence that many covered jurisdictions engaged in an "informal consultation process" with DOJ before formally submitting a proposal, so that the deterrent effect of preclearance was far broader than the formal submissions alone suggest. The Continuing Need for Section 5 Pre-Clearance: Hearing before the Senate Committee on the Judiciary, 109th Cong., 2d Sess., pp. 53-54 (2006). All agree that an unsupported assertion about "deterrence" would not be sufficient to justify keeping a remedy in place in perpetuity. See ante, at 2627. But it was certainly reasonable for Congress to consider the testimony of witnesses who had worked with officials in covered jurisdictions and observed a real-world deterrent effect.

For an illustration postdating the 2006 reauthorization, see South Carolina v. United States, 898 F.Supp.2d 30 (D.D.C.2012), which involved a South Carolina voter-identification law enacted in 2011. Concerned that the law would burden minority voters, DOJ brought a § 5 enforcement action to block the law's implementation. In the course of the litigation, South Carolina officials agreed to binding interpretations that made it "far easier than some might have expected or feared" for South Carolina citizens to vote. Id., at 37. A three-judge panel precleared the law after adopting both interpretations as an express "condition of preclearance." Id., at 37-38. Two of the judges commented that the case demonstrated "the continuing utility of Section 5 of the Voting Rights Act in deterring problematic, and hence encouraging non-discriminatory, changes in state and local voting laws." Id., at 54 (opinion of Bates, J.).

Because preclearance occurs only in covered jurisdictions and can be expected to stop the most obviously objectionable measures, one would expect a lower rate of successful § 2 lawsuits in those jurisdictions if the risk of voting discrimination there were the same as elsewhere in the country.

This lawsuit was filed by Shelby County, a political subdivision of Alabama, rather than by the State itself. Nevertheless, it is appropriate to judge Shelby County's constitutional challenge in light of instances of discrimination statewide because Shelby County is subject to § 5's preclearance requirement by virtue of Alabama's designation as a covered jurisdiction under § 4(b) of the VRA. See ante, at 2621 - 2622. In any event, Shelby County's recent record of employing an at-large electoral system tainted by intentional racial discrimination is by itself sufficient to justify subjecting the county to § 5's preclearance mandate. See infra, at 2646.

Congress continued preclearance over Alabama, including Shelby County, after considering evidence of current barriers there to minority voting clout. Shelby County, thus, is no "redhead" caught up in an arbitrary scheme. See ante, at 2629.

The Court does not contest that Alabama's history of racial discrimination provides a sufficient basis for Congress to require Alabama and its political subdivisions to preclear electoral changes. Nevertheless, the Court asserts that Shelby County may prevail on its facial challenge to § 4's coverage formula because it is subject to § 5's preclearance requirement by virtue of that formula. See ante, at 2630 ("The county was selected [for preclearance] based on th[e] [coverage] formula."). This misses the reality that Congress decided to subject Alabama to preclearance based on evidence of continuing constitutional violations in that State. See supra, at 2647, n. 8.